IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TYREE WILLIAMS | : CIVIL ACTION NO. |
| 3129 CECIL B MOORE AVENUE | : |
| PHILADELPHIA, PA 19121 | : |
| PLAINTIFF, | : |
| V. | : |
| | : JURY TRIAL DEMANDED |
| TEMPLE UNIVERSITY | : |
| 1801 NORTH BROAD STREET | : |
| PHILADELPHIA, PA 19121 | : |
| AND | : |
| TEMPLE UNIVERSITY POLICE | : |
| OFFICERS SABIR AND MITCHELL | : |
| 1801 NORTH BROAD STREET | : |
| PHILADELPHIA, PA 19121 | : |
| DEFENDANTS. | : |

COMPLAINT

JURISDICTION

1.  Plaintiff brings this action against the above captioned defendants, based

on claims pursuant to Title VII, 42 U.S.C. S 1981, the ADA and the ADAA, 42 U.S.C.

S 1983, the Family Medical Leave Act, 29 U.C.S.S 2601, et. seq., the Pennsylvania

Human Relations Act (PHRA), 43 P.S. S 8343 for defamation and Commonwealth

of Pennsylvania torts of invasion of privacy, assault and battery.  The Court has

jurisdiction over plaintiff's federal law claims pursuant to 28 U.S.C. S 1391.

Plaintiff further invokes the provisions of 28 U.S.C. S 1367, which allows the Court

to exercise supplemental jurisdiction over plaintiff's state law claims.

VENUE

2.  Venue in this matter is proper in the Eastern District of Pennsylvania

pursuant to 28 U.S.C. S 1391 because all of the parties are located in this district

and the acts that give rise to all of the claims occurred within this district.

ADMINISTRATIVE AGENCY REQUIREMENTS

3.  Plaintiff timely filed Charge Number 530-2019-03348 with the United

States Equal Employment Opportunity Commission (EEOC) on July 31, 2019

which was requested to be cross filed with the Pennsylvania Human Relations

Commission; he received a right to sue letter from the EEOC dated February 19,

2020.

PARTIES

4.  Plaintiff is an adult individual and citizen of the Commonwealth of

Pennsylvania and he resides at the address located in the caption above.

5.  Defendant Temple University is an institution of higher learning, a

University, which hires professors, administrators and other professional persons,

including police officers for its own police force, and it has an address as indicated

in the caption above.

6.   Defendants Sabir and Mitchell are employees of Defendant Temple University, and more specifically they are/were employed as police officers of the Temple University Police Department, and they have an address as indicated in the caption above.  They are both being sued in their respective individual capacities.  At all times relevant to the averments herein against them, they were acting under color of authority of state law.

FACTS

7.   Plaintiff is African American, and is disabled by way of having diagnosed "Persistent Depressive Disorder, with Anxious Distress, Early Onset, With Intermittent Major Depressive Episodes, with Current Episodes, Moderate (300.4), Other Problems Related to Employment (V62.29), unspecified mood disorder (DSM V Code F39)".

8.   As a result of his disability, plaintiff was substantially impaired in his major life activities including working, being able to tolerate work place stress and the ability to handle stress.

9.   Plaintiff was employed by defendant Temple University ("Temple" or

3

"defendant"), as its Assistant Director of Multicultural Student Recruitment at all times relevant to this action, becoming employed in such position in December 2016; plaintiff held that position during his entire employment with Temple.

10. In addition to being a Temple employee, plaintiff was also a doctorate student at Temple at the times relevant to this action.

11. Despite the disability and diagnoses stated in paragraph 6 above, plaintiff was able to perform all essential functions of his job/position with or without reasonable accommodations.

12. Plaintiff worked at Temple in the "Undergraduate Admissions Department", under the supervision of Mr. James Van Blunk and his second level supervisor was Ms. Karin Mormando, both of whom held managerial positions within the "department" and at Temple University.

13. As plaintiff was informed by his managers referred to in paragraph 12 above, he was responsible for attempting to increase and enhance diversity at Temple by contacting and providing information about the university to minority students in Philadelphia, its surrounding areas, and nationally; plaintiff was responsible for going out to high schools, giving presentations and finding

4

qualified minority students to possibly attend Temple; he was also responsible for reading and reviewing prospective students' applications for admission, and approving or disapproving them.

14.   At all times during his employment, plaintiff was well qualified for his employment, as evidenced in his performance evaluations by Mr. Van Blunk, which repeatedly rated him as no less than acceptable in all categories on the evaluations, and rated  him mostly as exceeded all criteria on them.

15.   After he was hired by defendant, plaintiff repeatedly requested a  written copy of his job description, but he was repeatedly refused or ignored by Mr. Van Blunk and Ms. Mormando; upon information and belief, neither of them wanted plaintiff to become aware that they were not allowing plaintiff to exercise the full realm of his responsibilities to enhance minority enrollment at Temple, and both Van Blunk and Mormando sought to quell any significant efforts by plaintiff to attempt to improve diversity at Temple, and to quell any attempts by plaintiff to increase minority representation at the university.

16.   Plaintiff began to feel that his management only sought to tokenize him and his position at the University, by placing an African American in the position, as if to present the false appearance that Temple was truly interested in diversity.

5

17.   Plaintiff became aware from a news article that the number of minorities, including African Americans, in particular, enrolled as Temple University students was declining significantly from around 2007 through 2017; he informed Van Blunk and Mormando of his observations, and they appeared ambivalent to what plaintiff was expressing to them, which caused plaintiff to experience emotional distress.

18.   Upon information and belief, Van Blunk and Mormando refused to provide plaintiff with his job description, because they sought to hide from him, his true responsibilities, so that they could thwart his potential exercise of those responsibilities, but rather limit his activities to what they preferred; those limitations included repeatedly thwarting plaintiff's recommendations and ideas on how to enhance minority recruitment, which had racial implications against such minorities, including African Americans and Blacks.

19.   For example, although plaintiff became aware that his duties included outreach to minority students outside of Philadelphia, and out of state, Van Blunk and Mormando refused to allow him to go outside of Philadelphia; plaintiff was aware that there may be significant potential for minority recruitment in other

states, particularly in Atlanta Georgia, but this aforementioned managers refused to allow him to travel out of state.

20.  Plaintiff once asked Ms. Mormando what made his position any different than any other recruiter for Temple, based on the limitations she was imposing on him, and she responded words to the effect of "your physical presence/appearance", essentially inferring that plaintiff was selected and maintained in his position because of his race and color, to apparently put a "Black face" on his position.

21.  In/around 2017-2018 and thereafter, plaintiff began suffering increased resistance from his management to do anything significant to increase minority enrollment at Temple; these actions included denying him access to necessary historical data about minority enrollment.

22. Although plaintiff learned that he was responsible for being a point of contact for prospective minority students in Arkansas, Iowa, Louisiana and Missouri on a Temple website, his management refused to allow him to reach out to these prospective students and refused to provide him information and opportunities to reach out to students in those areas.

23.  In the fall of 2017, Ms. Mormando had a diversity program entitled "Owl

7

Things Considered" canceled for no valid reason, refusing to give plaintiff

information and resources he requested for the program; plaintiff asked about

continuing the program, but it was never continued; Ms. Mormando also fired

another African American working on the program, Vince McNeil; on another

program, which plaintiff had organized by himself, Mormando replaced him

without notice, and plaintiff only found out that he had been replaced when he

showed up for the event, and saw the other person in charge of it.

24.  In the spring of 2018, Plaintiff's director confronted him for excluding a

white student from a panel that was specifically designed and approved by

Temple management to address the questions and concerns of high school

students of color, by having them meet with Temple students, alumni, faculty and

staff of color in order to learn about different pathways and journeys to obtain

quality college education.

25.  In the fall of 2018, plaintiff was removed as the moderator of an event

called the "All Spanish College Night", without any valid explanation, although

plaintiff had and was prepared for the event.

26.  Ms. Mormando's refusal to make herself available for necessary

approvals and meetings resulted in the program to enhance Hispanic recruitment,

8

called "Latinx" being postponed from the spring of 2018 until the fall of 2018,

resulting in rushed planning and low registration when she finally did approve the

program.

27.   Plaintiff's supervisors, referred to above, would not allow him access

to his program's budget, so that he plan accordingly.

28.   Plaintiff was denied data on students of color at Temple, in

Philadelphia and nationally, which hindered his ability to make strategic decisions

which would impact the very students that he was responsible for recruiting.

29.   Plaintiff was promised that he would be assigned a team of

"ambassadors" who would assist him with events, however this never occurred;

Ms. Mormando and plaintiff's predecessor later told him that program had been

phased out due to the students in this role being treated as "second class

citizens" in the past.

30.   Mr. Van Blunk regularly told plaintiff that it was Ms. Mormando who

was blocking his access to the resources and help that he needed to perform his

job effectively, and he promised plaintiff that those things were coming, but they

never came.

31.   Plaintiff shared his concern with Mr. Van Blunk that he was not being

treated as the Assistant Director of Minority Recruiting (ADMR), but rather just as

the "Philadelphia recruiter"; Van Blunk replied that this would only be temporary,

and that the delay in allowing plaintiff to do national recruiting was attributable

to plaintiff's position being vacant for a period of time after his predecessor "left";

this restriction on plaintiff's job was never lifted.

32.   Plaintiff made a complaint to Ms. Tracey Hamilton, Temple's, "Equal

Opportunity Compliance" (EOC) manager regarding concerns about the

restrictions and limitations that were being imposed on him by his management.

33.  Plaintiff's complaint to Ms. Hamilton had racial implications, and included

his concerns about not receiving critical data needed to properly due his job,

including family income of students of color who had applied/been admitted/ and

deposited money with Temple; determining whether there as a correlation and

causation between family income and the number of applications, admissions and

deposits; data regarding geographic disbursements of students of color that have

applied, been admitted and made deposits with Temple, which could assist in

future outreach efforts, including variables such as family income, standardized

test scores and grade point average (GPA); relationships between Temple's tuition

rates and scholarships and deposits by prospective students of color; information

about admission and retention outcomes for students of color, after the "phase out" of the Russell Conwell center; the counts and percentages of students by family income level by race and ethnicity; graduation and retention rates broken out by race and ethnicity for 5 recent freshman cohorts.

34. When plaintiff was finally given data for Philadelphia students, within minutes he discovered alarming trends, including the number of incomplete applications from applicants from Philadelphia, including that a third of them were incomplete and that half of those were from African American/Black applicants.

35. Plaintiff made the information that he discovered known to his management, only to be met with arguments and false justifications for not making any changes to Temple's practices.

36. Plaintiff observed that his recruitment actually had nothing to do with multicultural recruitment, but rather that his function was the same as other Temple recruiters, with an expectation that he would simply visit schools and would provide them with identical information as his Caucasian counterparts, with no information designed to promote diversity recruitment.

37. When Ms. Mormando told plaintiff when he asked her what made him

different from his Caucasian counterparts in terms of recruitment, she stated in the presence of Human Resources representatives Ms. Culbreath-Walton and Ms. Brown, that the difference was his "physical presence"; plaintiff stated back in response during that conversation, that was a clear example of how he was tokenized, that his physical "Blackness" did not equate to diversity recruiting"; Neither Ms. Culbreath-Walton or Ms. Brown sanctioned Ms. Mormando for her statement, or took any corrective action for it.

38.   Plaintiff complained to Ms. Mormando, Ms. Culbreath-Walton and Ms. Brown that it made no sense, and did not amount to diversity recruitment that he was required to attend all local high schools regardless of the makeup of the student body, being required to attend many times, schools that were comprised mostly of Caucasian students – no corrective action was taken.

39.   Plaintiff was denied the necessary data, job description, and assistance that he needed to do his job properly by Temple's management; his similarly situated Caucasian peers (recruiters) were not so denied the tools they needed to do their jobs properly.

40.   When plaintiff sought to provide feedback to Mr. Van Blunk and Ms.

Mormando about the serious deficiencies in his program, he was met with

resistance, including their arguing with him and their hostility against him,

regarding what was needed.

41.  Ms. Mormando repeatedly refused to make herself available to

receive information about programs that were pending, or she postponed or

canceled them without valid justification; Ms. Mormando engaged in a series of

conduct against plaintiff including the following: (a) not allowing plaintiff to

attend diversity events planned in his office, despite repeated requests by

plaintiff to attend, rather she would assign him work at an outside post directing

people to the building where the event was being held; (b) repeatedly declining

plaintiff's proposals that would have promoted diversity, without justification;

( c ) refusing to address the concerns by plaintiff and other employees of color

that they were being tokenized and being used to answer questions regarding

diversity at Temple without being provided important data necessary to properly

do so, resulting in them being met with negative reactions by prospective

students and their families; (d) declining to implement plaintiff's proposed

program that would have enhanced his ability as well as the persons referred to in

paragraph( c ) above, to answer questions about diversity at the University; ( e )

13

refusing to take corrective action about inappropriate and racially discriminatory

remarks being made in the work place, and then condoning those employees'

verbal backlash against plaintiff when he challenged their conduct; (f) not

allowing plaintiff to perform portions of his job that promoted diversity; (g) not

allowing plaintiff to attend important quarterly admissions meetings after telling

him that he would be allowed to attend them; (h) blaming plaintiff for not

notifying a school that he would not be able to attend a meeting while he was out

on FMLA leave, which she and Mr. Van Blunk knew was their responsibility while

plaintiff was on such leave; (i) refusing to approve a "diversity student

recruitment team" who would be paid for their work, rather deciding to obtain

volunteers each time there was a program, and not paying them; (j) Ms.

Mormando stated that in the past, diversity tour guides had been treated like

second class citizens by other tour guides and staff and she did not propose any

effort to stop such treatment; (k) fielding alleged complaints about plaintiff and

mischaracterizing them to him, without obtaining feedback from him, prior to

concluding that he had done something inappropriate – and then refusing to

apologize upon finding that he had not acted inappropriately, but rather she

backed Van Blunk's directive that he attend communications training; (l) falsely

attempting to paint a picture of plaintiff as problematic employee with poor communications skills; (m) arguing against bi-lingual materials for students and families like other colleges and departments used as a standard practice.

42.  Despite the fact that plaintiff was not allowed to recruit outside of Philadelphia, on March 28, 2017, Temple News published an article entitled "Changing Face: How the Student Demographic is Changing"; within the piece, Temple's former Senior Vice Provost of Enrollment specifically stated that "recruiting students in local an out-of-state areas that "yield diverse applicant pool", like Atlanta, is built into the Office of Admissions' strategy from the start. There is also a fulltime staff member solely responsible for recruiting Philadelphia high school students"; these statements were either patently false and/or misleading to the general public, as plaintiff would have been the staff member referred to in the article, and he was not allowed to recruit outside of Philadelphia.

43. Although plaintiff was supposed to be involved in assisting with scholarship programs, his supervisors only allowed him to email Philadelphia high school counselors, to notify them of OAS and make a list of those who returned it.

44.  Ms. Mormando managed all scholarships and rebuffed all advice

and recommendations that plaintiff gave regarding what to do to ensure that they
were equitably allocated.

45.   Although it was supposed to be a part of his job duties, plaintiff was never
allowed to review candidates for the "Emerging Scholars Program" which was
supposed to exist, but never existed while plaintiff was employed by defendant.

46.   When plaintiff would address deficiencies in his program's minority
recruiting in staff meetings headed by Mr. Van Blunk and Ms. Mormando, rather
than respectfully discussing the items with plaintiff, his peers would verbally
attack him in the meetings, and Mr. Van Blunk told plaintiff that he should find a
way to make people whom plaintiff perceived were engaging in problematic
and/or discriminatory practices "feel better" or preface his statements against
that conduct, in a way as to avoid potentially upsetting them.

47.   In a grievance hearing the fall of  2018 with Ms. Mormando, when plaintiff
 asked her exactly how his job was intended to increase multicultural student
recruitment, what efforts he was doing and how she and Mr. Van Blunk were
supporting him, she was unable to verbalize what the goal of his position was, or
how it overlapped with the goals of Temple's undergraduate admissions office;
she could not identify anything that plaintiff was working on other than the Latinx

program that had been a relative failure in the spring of 2018, based on her improper supervision of that program; rather she mentioned only general efforts that plaintiff was making based on school zip codes and prior years application numbers which were not related to multicultural student recruitment.

48.   Although Mr. Van Blunk wrote performance evaluations for plaintiff In 2017 and 2018, rating him mostly as exceeding expectations for the listed criteria, and no less than meeting expectations for all criteria, in 2018 Van Blunk began what appeared to be an ongoing campaign of unjustified verbal criticisms of plaintiff, tantamount to harassment.

49.   In/around the middle of 2018, when the building was not properly heated and it was cold outside, staff wore outer garments inside to keep warm; Ms. Mormando singled plaintiff out for a directive not to wear a "hoodie" (plaintiff is bald and wore the hood to keep his head warm); Mormando suggested that the wearing of such a type of covering was not professional and was inappropriate for wear by a Temple employee, although there was no restriction against such head covering in Temple's dress code; Plaintiff contacted human resources about the matter which confirmed that there was no policy against wearing a hood, but told him that he should appease management by not wearing one.

50. Van Blunk told plaintiff that he had received a complaint about plaintiff regarding his interaction with a student from Central High School which allegedly consisted of a complaint that during a telephone call, that plaintiff had hung up on the student; the complaint was false, and Van Blunk later admitted that the person who complained, Central's counselor, had merely voiced concern that he did not believe that plaintiff was as quickly responsive to inquiries as his predecessor had been.

51.  Rather than contacting plaintiff first to tell him what was stated about him, Van Blunk attacked him verbally as if what was complained of was fact, and made a decision to have someone else appointed to be the point of contact with Central – Mormando backed Van Blunk in this approach for handling plaintiff, which was different than the respect that they afforded to plaintiff's similarly situated Caucasian peers in the department; Mormando, Van Blunk and a Central administrator had a meeting without notifying plaintiff, after which plaintiff requested a grievance hearing.

52.  Later in a meeting with plaintiff, Van Blunk and Mormando refused to accept the fact that he had not hung up on a student; they were aware that

plaintiff was reasonably focusing efforts on recruiting applicants from other

schools which had been historically underrepresented at Temple, in comparison

with Temple.

53.  On an occasion, plaintiff informed Mr. Van Blunk that many counselors in

the city were blaming him for the number of students in Philadelphia being

rejected for admission at Temple, and telling plaintiff that Temple was

intentionally working to keep "Black and Brown kids" out, and that he was

personally complicit in these actions, to which Van Blunk responded, "tell them to

prove it".

54.  Central's counselor confronted plaintiff about some of that school's

students being rejected for admission to Temple, because he knew their

qualifications – based on the lack of information that plaintiff was receiving from

his management, including data on admissions and reasons for denials and other

pertinent information, plaintiff was unable to properly discuss the issue with the

counselor, negatively affecting his professional reputation.

55.  In the fall of 2018, plaintiff attended an event by Temple's NAACP –

he did not attend in his professional capacity, but only as a student; on "9/11" Ms.

Mormando emailed plaintiff informing him that a representative from the chapter

19

had complained about a question that plaintiff had asked, and a false allegation that plaintiff had "grabbed" the microphone, interrupted students and stormed the meeting.

56.   Plaintiff emailed Ms. Mormando back on September 12, 2018, informing her that the allegations were false, and that as a member of the audience he merely asked a relevant question, which apparently persons in attendance on the panel were not prepared to answer; rather than accepting what plaintiff was telling her was fact, Ms. Mormando contacted another Temple administrator to determine if he was telling the truth, and then confirmed in an email that he had told the truth; in the midst of her interaction with the administrator, Ms. Mormando told him that she had heard things about plaintiff and that she just wanted to follow up because she had "concerns".

57.   Despite knowing that plaintiff had merely exercised his right of free speech in a public forum, in his capacity as a doctoral student, Ms. Mormando and Mr. Van Blunk pressured plaintiff to change his position about what he had asked at the meeting, and to apologize to the NAACP in person, however they reversed their position on this issue because they feared that if such a meeting

occurred, that plaintiff would refuse to apologize and that it could negatively affect the department's ability to use students from the NAACP as volunteers for Temple events in the future.

58. It was Ms. Mormando's plan to use students of color at Temple as volunteers as "ambassadors" when the department got requests from outside groups for visits or panels and wanted to speak with Black and Brown students as opposed to simply hiring and paying students for their time and service; Ms. Mormando's concern about wanting plaintiff to apologize was merely to retain the ability to use students of color for free to the department's advantage in the future.

59.  Plaintiff had a discussion with Mr. Van Blunk about incidents involving Ms. Mormando and Mr. Abbott, Vice Provost for Admissions, Financial Aid and Enrollment Management on September 26, 2018.

60.  Prior to the conversation referenced in paragraph 59 above, plaintiff had never received any documented negative comments or feedback from his supervisors, such as reprimands, discipline or counseling or negative ratings.

61.  On September 27, 2018, plaintiff shared his concern with his management that he was being forced to do the job of Temple's visitation team without having

21

been provided access to the tools and resources needed for that task, including the ability to schedule rooms, tour guides, etc.; this was an ongoing concern that plaintiff had brought up over that past year, highlighting the fact that he was expected to perform the duties of the "Associate Director of Campus Visits" even when there was someone else in that role.

62. Mr. Van Blunk informed plaintiff that he wanted to meet with him on September 28, 2018, at which time plaintiff thought they were going to address his concerns summarized above, however, Van Blunk blindsided him, telling him that he was being mandated to attend a communications training; plaintiff viewed this action as retaliatory for complaining on/around September 26-28, 2018 about his work conditions, which he perceived were racially motivated.

63. When plaintiff asked Van Blunk why he was making him attend such a training, Van Blunk stated words to the effect, that because plaintiff was always embroiled in something at work, that he never thought it was his fault, and that plaintiff would push back when given directives; the reasons that Mr. Van Blunk stated were knowingly patently false.

64. Prior to the conversation on September 28, 2018, Van Blunk had written In plaintiff's performance evaluation, that "Tyree never says no", which was an

accurate assessment of his true performance and conduct – additionally

whenever plaintiff provided feedback in what he thought were open discussions,

his points were always in the form of constructive feedback on how to enhance

the department, which Van Blunk knew.

65.  Van Blunk brought up an interaction that plaintiff had with one of his

co-workers, who became rude and sarcastic with plaintiff in a planning meeting

after he provided an idea, and then she demanded that he perform the task,

although it was not his responsibility (creating the content for a slide on

diversity); the co-worker, a Caucasian woman, did not have the authority to task

plaintiff; plaintiff informed Van Blunk that it was the responsibility of that team to

perform the task, and that when "Abbey" attempted to direct others on the team

to do so, that they, including Rachel and Brian pushed back and that Abbey did

not have a similar negative response to their feedback that she had to his

feedback.

66.  Van Blunk claimed that the team members referenced above, were upset

with the manner in which plaintiff declined Abbey; plaintiff further explained to

Van Blunk that he virtually told the other employees what to put in the slide, how

to make it, and why it was important for diversity, only to be met with their

backlash, requiring plaintiff to defend the importance of having such a slide

showing diversity at Temple; once when plaintiff complained to Van Blunk about

how his co-worker, Beth was speaking to him, he simply told plaintiff that he

would add plaintiff to the list of people who had complained about her, declining

to take any corrective action; Conversely, Van Blunk once told plaintiff that others

viewed him as "aggressive", without any sensical basis for such a characterization;

Van Blunk cited an occasion when plaintiff simply asked in an open forum in a

meeting with the Undergraduate Admissions team and the team from another

department, how they planned to increase the number of African-American males

enrolled – the meeting was in the form of "Q & A"; Van Blunk stated that the

question was "aggressive" because it placed the team on the spot.

67.   Mr. Van Blunk and Ms. Mormando would repeatedly verbally characterize

plaintiff falsely, using words such as angry, aggressive and provocative, all which

have historically been used as code words for racism against African-Americans

and Blacks; plaintiff would suffer some form of emotional distress when hearing

his management refer to him, or about him, with these words, which he believed

were done to racially discriminate against him, as they did not use similar

characterizations for similarly situated Caucasian employees under their

management with similar styles as plaintiff.

68.   Prior to the concerns that plaintiff shared with Mr. Van Blunk on

September 26, 2018, Van Blunk had praised his work ethic, telling plaintiff how

great he was doing, that he had no issues with his work, and that he helped make

the team better; plaintiff was given a bonus for his work performance in August

2018.

69.   Plaintiff never received any negative feedback or critiques on his

performance evaluations, which directly contradict Van Blunk's directive that he

attend communications training; when Van Blunk was asked by plaintiff about

how he was doing, he told plaintiff, great, that he had great ideas, and that he

had no worries or concerns about plaintiff.

70.   Plaintiff asked Van Blunk a number of pertinent questions as to why he

was being singled out to attend the communications training, citing events where

after investigation, Van Blunk and Mormando had admitted that they had been

given false and misleading information from people in and outside of the

department about his interactions with them, including that he had not hung up

on a student, that Abbey was rude and singled him out for something he was not even responsible for, and plaintiff asked what Van Blunk believed he would gain from such training.

71.   Plaintiff regularly received positive feedback from students, teachers, counselors, parents and other constituents that he came in contact with in his role as ADMA, including telling him how different he was from other representatives in the admissions office, as a compliment; plaintiff received a text message commending his performance from "Jenee", Temple's partner with Motivos Magazine, stating, "helping students at KCAPA with college essays last week and Nisser (counselor) mentioned how different you've been than past Temple admission folks, how students now feel that Temple actually would really like to have them apply and  attend/are interested in them".

72.   Counselors at Philadelphia high schools regularly reached out to plaintiff to attend their events and work with their students, and on their programs including through plaintiff's personal organization, even after he was fired from Temple.

73.   Plaintiff had exemplary attendance while working for Temple, including not using his accumulated leave to the extent that he always had an unused

26

balance at the end of a year; coming into work on days off to assist the team, when it was short staffed on multiple occasions; preparing for and hosting a program while he was on leave; despite knowing that plaintiff was working during his off time, Mr. Van Blunk refused to compensate him, because he disagreed with the number of hours that plaintiff reported working, indicating that he did not think that what plaintiff actually did would take much time, and that what plaintiff did had little variation from a past program.

74.  On one occasion, management unnecessarily summoned plaintiff to work to get information that they claimed only he had, which was untrue; other team members who were scheduled to work, had the same information plaintiff had.

75.  As a result of his environment, plaintiff was suffering psychological illness manifesting itself in the form of depression, anxiety, crying spells and panic attacks at work, which came without warning; plaintiff was subconscious about the real possibility that he could have some form of a "breakdown" while dealing with staff and the public, and believed that he needed to consider taking family medical leave under the Family Medical Leave Act (FMLA) to obtain mental health treatment.

76.  On October 26, 2018, plaintiff submitted a request to Temple for FMLA

which included his therapist's paperwork containing his symptoms, diagnoses and other pertinent information about plaintiff's condition and the rationale for the leave; the paper work included how long plaintiff had been in the therapist's care.

77.   Plaintiff's therapist indicated that she was unable to complete the written request in full, because she had not been given certain information, including the essential functions of plaintiff's job, or a job description, which information plaintiff had been denied by Temple, and his therapist was not able with certainty to indicate how long he would need to take leave, based on plaintiff's condition.

78. The therapist also believed that there was a conflict of interest because plaintiff was an employee at Temple; plaintiff shared these concerns with Temple's management, and the materials necessary for leave, were all submitted to Temple; any delays in the processing of plaintiff's application were out of plaintiff's control, which Temple's management knew.

79.   Plaintiff explained to Temple's management, Mr. Johnston, who was in charge of leaves and absences that he was going out do to issues related to mental health, and that it was impossible for him to provide a date certain, by which he would be healthy enough to return to work.

80.   Plaintiff perceived that Temple's management was resistant to accepting

28

the fact that he was ill, because his illness was psychological rather than physical in nature, although it had physical manifestation; for example when plaintiff was coming back to work in late April 2019, Ms. Brown told him on April 25, 2019 in a telephone conversation, that she did not understand why plaintiff could not make Temple's offer of a reasonable accommodation of being allowed to work one day remotely (from home) work, since he had been able to work for some time with his illness before he went out on FMLA leave.

81.  Plaintiff did not believe that Ms. Brown would have told someone suffering from a physical disability, which had occurred at work, that they should be working in the same conditions that eventually caused and/or significantly exacerbated their injury, simply because although injured, they had tolerated the effects of the injury in the past, prior to taking medical leave.

82.  Plaintiff's therapist informed Temple in writing that his "flare ups" refer to his anxiety attacks and crying spells, and the areas where his work would be compromised during "critical and relevant job skills pertaining to social-emotional reciprocity are required", which referred to addressing his inability at the time to determine when these attacks would occur, meaning in the office, in meetings, on

the road, or during presentations; plaintiff's therapist was aware that his office environment was among the biggest triggers for his breakdowns due to the actions and words of other personnel in the office.

83. Mr. Van Blunk had witnessed plaintiff having panic attacks, including one which occurred in Van Blunk's office.

84. Prior to going out on FMLA leave, one of plaintiff's colleagues from another department referred him to Ms. Culbreath-Walton (Walton), Temple University Director of Human Resources, regarding his concerns of discriminatory and retaliatory actions against him; plaintiff spoke to her via telephone on August 29, 2018, sharing his concerns with her, that he felt he was being racially tokenized in his role, was being denied the proper tools and resources to do his job, and was not being told what his actual duties and expectations were; plaintiff asked Ms. Culbreath-Walton ("Walton") for a copy of his job description, but she never provided it to him.

85. In his communications with Ms. Walton, plaintiff shared with her emails reflecting his plans for that year, past travel logs and his past requests for data; plaintiff did not hear back from Ms. Walton for months, when he was attempting to obtain a mediation with his management about his concerns.

86.  Plaintiff's colleague also referred him to Temple's Equal Opportunity Compliance (EOC) manager, Ms. Hamilton, whom he spoke to first via telephone and then sent her a 9 page email dated December 13, 2018, expressing his feelings of being tokenized in his role as the ADMA.

87.  The email referred to in the preceding paragraph contained the following items in summary: (a) plaintiff's belief that his directive to attend communications training was retaliatory; (b) plaintiff's being unsure of what his job duties were, what the expectations were for the job, as it related to multicultural recruitment; (c) plaintiff's perception that little had been done historically to promote student diversity; (d) being required to act as a Philadelphia admissions counselor as opposed to the ADMA for the university; (e) feeling tokenized and being one of two people of color on the undergraduate admissions/transfer team, being responsible for being the "brown face" for Temple, when the school claimed it desired a diverse staff; (g)  being repeatedly attacked, disrespected, condescended to by staff members in meetings, particularly when he brought up issues about  race, access, equity, and the need for the department to improve, focusing on those areas; (h) Ms. Mormando's lack of timely response for time sensitive issues, negatively impacting plaintiff's ability to plan events; (i) being

told that he was "unprofessional" because he used the word "y all", and for

wearing a hood on his head when the building heat was malfunctioning and it was

62 degrees, while other employees in the office were walking around the office

wrapped in blankets without sanction, and eventually being directed to wear a

skull cap rather than a hood; (j) complete lack of response to his concerns brought

to his attention about leadership, when compared to the immediate response of

others, when they made complaints about him; (k) the fact that he and the "Owl

Ambassadors" of color had been repeatedly placed in situations where they felt

uncomfortable and unprepared for Black and Brown visitors who would ask them

to keep it real, meaning asking them questions that they would not ask Caucasian

guides/staff about what it was really like at Temple for students of color, exact

data on retention/graduation for them, items which plaintiff repeatedly asked

Ms. Mormando and Mr. Van Blunk for and which they denied; (l) that numerous

ambassadors of color told management that the questions they were being asked

made them uncomfortable, particularly since Ms. Mormando had made it a point

state that she and/or Temple only desired that no more than 38% of students at

Temple identify as something other than Caucasian; (m) that plaintiff's team

members would often sit and gossip about others at the university, focusing

particularly on a group of African American women, characterizing them as

incompetent and unprofessional, including Ms. Flowers, Ms. Reddick and Ms.

Jones, admissions representatives in another department.

88.  Ms. Hamilton did not suggest mediation at that time, but plaintiff again

requested it when he met with her in January 2019.

89.  Hamilton stated via email that mediation was not an option on/around

January 28, 2019, indicating that a mediation could not occur while plaintiff was

out on leave – in the past Temple had allowed plaintiff to come to work while he

was on leave, when it wanted him to help out with programs.

90. Plaintiff continued to make requests for mediation thereafter until

he received an email from Mr. Johnston, Temple's Director, Workers'

Compensation & Absence Manager, who sent him an email noticing mediation for

February 27, 2019.

91.  Mediation occurred on February 27, 2019, wherein plaintiff rehashed the

concerns he had made to his management, Ms. Walton and Ms. Hall, however

nothing was resolved.

92.  Based on Mr. Van Blunk's insistence on telling him how matters could

best be resolved, plaintiff when asked what the best course of action would be for

diversity at Temple, informed him that it was his opinion that it would be best if

he and Ms. Mormando were resigned or were fired; at that point all Van Blunk ,

Mormando, Hall and Walton became extremely upset with plaintiff.

93.  Plaintiff cited examples during the meeting which he believed supported

his position, including that Mormando had stated that the only way to increase

the number of Black/Brown students at Temple would be to lower the quality

expected of applicants, a racist statement; this occurred in a meeting, and

plaintiff immediately spoke up to the statement, only to receive negative backlash

from team members who sought to defend or excuse Ms. Mormando's

statement; Ms. Mormando informed others at the mediation, when asked about

the statement, only that she could not recall making it, not denying making it.

94.  Plaintiff asked Mr. Van Blunk about Ms. Mormando's statement, since

plaintiff had reported the statement to him, when it occurred, and he was

resistant in confirming that it had been made.

95. Plaintiff shared with the mediation attendees  that he was concerned over

the decline in Black student enrollment under his management, which fell from

around 25% to 10% during that time; he also shared that he was concerned for

Mormando's lack of concern regarding the department's purported mission, and

the lack of proper training for the department staff.

96.  Plaintiff told Mr. Van Blunk that he had created a toxic and uncomfortable

work environment by speaking loudly with his subordinates in groups, about Ms.

Mormando, saying that she was not a good leader, that she is not good with

people, and that all she knows are numbers; plaintiff shared with him that when

they would sit together, that it made plaintiff uncomfortable when Van Blunk

would sit and negatively discuss other current and past Temple employees,

particularly a group of African American women (Flowers, Reddick and Jones), and

a former employee named Nikki Mandrinos.

97.  Plaintiff informed Mr. Van Blunk that it was inappropriate for he and

plaintiff's co-workers to scour the personal social media of applicants and make

disparaging remarks about them, including their physical appearance and their

current and past work histories.

98.  Van Blunk only attempted to rationalize his conduct, indicating that such

behavior is normal in office work settings; that gossiping was normal at work;

Ms. Brown and Ms. Walton observed the interactions between plaintiff

and Van Blunk and Mormando, however they did nothing to attempt to mediate

or resolve the issues.

100.  A second mediation occurred on April 15, 2019, at which time

Mr.Van Blunk admitted that he was unjustified in mandating that plaintiff attend

communications training, and that the rationale that he had given to justify the

training was not true, including falsely characterizing plaintiff as "aggressive", for

simply asking how a peer sought to increase Black male enrollment at Temple; On

April 9, 2019, plaintiff  had met with Ms. Clubreath-Walton who told plaintiff Mr.

Abbot had stated that he did not know what to do with plaintiff, since he had

never had an employee demand a grievance hearing while out on leave, and had

never heard an employee respond that his bosses should be fired; Walton told

plaintiff that he needed to contact Ms. Hamilton about the investigation, because

Hamilton did not realize that he was reporting discriminatory acts and had only

spoken with one of the witnesses (Raymond Johnson) that plaintiff had provided

her a list of, including witnesses in the office or in the office external to the

admissions department; Culbreath-Walton also indicated that she did not believe

that Ms. Mormando had been truthful in the prior mediation, and felt that

plaintiff needed to come back to work because he was needed to combat the

status quo that existed in his office, and that condition was negatively impacting

students of color at Temple – she shared other concerns about her son and other

Temple employees of color, whose children had been refused admission at

Temple, and how it was beginning to be a problem; Ms. Walton shared that

Temple's Vice President of Enrollment, Mr. Shawn Abbot was hearing negative

things about him from Mr. Van Blunk and Ms. Mormando, who had his ear, and

Abbott made remarks to her that gave her concern about whether plaintiff might

be retaliated against.

101.  At the end of the second meeting, it was agreed that prior to plaintiff

returning to work, that he would meet with Mr. Van Blunk to go over

expectations going forward as ADMA, as well as to establish specific multicultural

recruitment efforts based upon peer institutions – this meeting never took place.

102.  While plaintiff was out on leave, Ms. Mormando refused his multiple

requests for a list of "peer institutions", telling him that he had to wait to return

to work; this was despite her willingness in the past, to let him work while he was

out on leave; Mormando had promised that this would be provided to plaintiff

prior to him coming back from FMLA leave; it was also agreed that Mr. Van Blunk

would meet with plaintiff before he returned to confirm expectations, duties and

responsibilities.

103.  When plaintiff finally was able to speak to Mr. Van Blunk, after he had

taken off, Van Blunk told plaintiff that Mormando had instructed him not to meet

with plaintiff before his return to work, despite being one of the primary things

agreed to at the second mediation.

104.  Plaintiff informed Ms. Brown that his management was refusing to meet

with him as agreed on/around April 15, 2019 and Brown confirmed that was what

had been agreed to.

105. Prior to returning to duty, all materials required on plaintiff's behalf

were submitted to the appropriate Temple offices, and at no point prior to his

return did anyone from Human Resources tell plaintiff that he could not be

reasonably accommodated.

106.  Plaintiff's therapist had sent an "ADA Certification" report to Temple

dated March 9, 2019, describing plaintiff's disability, his diagnosis, and requesting

that he be reasonably accommodated by having the ability to work remotely as

needed instead of requiring that he be working exclusively from his desk;

according to the certification, this accommodation would, "significantly reduce

the stress caused by interaction within work environment, causing panic attacks";

the ADA Certification is on Temple's Form HR-ER04.

107.   Ms. Brown called plaintiff the week before he was supposed to return to work on n April 24, 2019,  at which time she asked him if the requested accommodation was asking that he be allowed to work "100% from home"; plaintiff explained that the request was only for the option to work remotely as needed, as opposed to being at his desk at all times, including when he had feelings of anxiety that were becoming overwhelming; Ms. Brown did not indicate any problem with the request after such explanation at that time, nor did anyone else contact plaintiff regarding the requested accommodation prior to his return to work, and after he had worked a full day on April 24, 2019; when plaintiff returned to work he was not given access to all files and documentation that he needed to perform his job; on April 25, 2019, plaintiff received a call from Ms. Brown and Ms. Culbreath-Walton informing him that he could not work remotely, instead offering him the use of a public, shared office space in the event that he suffered a panic attack.

108.   Temple never provided plaintiff any explanation as to why it believed, or if it believed, that the request for reasonable accommodation would create an

undue hardship for the university; rather its management stated that because a

large part of his job took place outside of the office, that having the option to

work remotely as opposed to at his desk during a crisis would be unreasonable.

109.  Temple's rationale did not have merit, because allowing plaintiff to work

remotely as needed, did not create an undue hardship; there were periods when

plaintiff had already been allowed to work remotely; Temple keep misinterpreting

the request as one to work at home, which was not the case, rather the word

remotely referred to anywhere outside of the office; Temple's offer to place

plaintiff in a shared space with the team would still not result in him being able to

work effectively, as there was no equipment in that area; plaintiff would only use

the accommodation to work remotely when he felt an impending anxiety or panic

attack coming on, or when he started feeling overwhelmed by triggers in his

office;  if plaintiff was actually having an anxiety/panic attack he would be

temporarily incapacitated from working, including interacting with others.

110.  Temple refused, at all times, to engage in an interactive process with

plaintiff to come up with a reasonable accommodation.

111.  Temple's management also falsely argued that an essential part of

plaintiff's duties were to meet with families when they came in and give them

tours – this was untrue, as Temple admissions has a separate team for those

tasks; plaintiff had never been trained to give tours and had never led one during

his employment at Temple.

112.   During a telephone call with Ms. Brown and Ms. Walton on April 25,

2019, Ms. Brown heavily suggested that plaintiff could not be trusted not to

abuse the accommodation of being allowed to work remotely as needed, by

stating, "how do your bosses know that you won't just take advantage of being

able to work remotely to just not come in?".

113.   Plaintiff informed defendant, as it already knew, that he also lived only

approximately 12 minutes driving distance from the university, and that if there

was a need for him to come to the office immediately, if he was at home, he

could just come in, but that if plaintiff had been at home, that he had been

dealing with a "crisis" and he would not be able to be effective until his

panic/anxiety subsided, after which time he would come in.

114.   On Friday, April 26, 2019, Ms. Walton informed plaintiff that he was not

allowed to return to work, because he had not accepted Temple's offer that he

work in a shared space; as of this time, due to an issue with his therapist, in which

plaintiff felt that he was not getting therapeutic benefit, he was no longer seeing

that person as of April 25, 2019, and did not have access to him to obtain medical

documentation to supplement the March 9, 2019 ADA certification – plaintiff had

nobody at that time to contact Temple on his behalf to attempt to rationally

negotiate a reasonable accommodation, which Temple knew; nor had plaintiff

anticipated that his medically recommended accommodation would be

summarily rejected, and that he would need a doctor to further be involved in

securing a reasonable accommodation, as he had followed Temple's protocol.

115.   Ms. Walton refused to provide plaintiff with any possible options he

had to address accommodations, despite his requests; rather on April 29, 2019,

she informed plaintiff via email that Temple had decided that it would allow him

to work remotely from home one day per month, something that plaintiff had not

requested; Ms. Walton instructed plaintiff to show up for work the next day if he

agreed to Temple's directive.

116.  Confused, and fearful that his health would be compromised if he agreed

to Temple's directive that he only be allowed to work remotely from home once

per month, plaintiff did not agree; his decision was also based on what his

physician had recommended, in compliance with what had been medically prescribed.

117.  In her April 29, 2019 email, Ms. Walton made no reference to plaintiff having to provide a doctor's note or certification that he could work under the condition that Temple imposed, prior to returning to work the next day.

118.  However, on April 30, 2019, at around 5:44 p.m., Ms. Walton emailed plaintiff and gave him an ultimatum that either he provide a doctor's note stating that he would be able to work remotely one day per month from home, or that he would not be allowed to come back  to work, and that he would be fired.

119.  Ms. Walton gave plaintiff six days to find a new therapist, obtain an appointment, be evaluated, diagnosed and received a written report agreeing with Temple, or he would be fired.

120. These requirements were physically and practically impossible, which Temple knew – Temple also intentionally declined to offer plaintiff to see its own psychiatrist for an independent medical evaluation – although such an evaluation might be tainted with possible bias in the university's favor.

121.  Temple, including Ms. Walton, arbitrarily rejected the medical docu-mention that plaintiff provided it that recommended and explained the need for

43

the reasonable accommodation prescribed.

122.  Plaintiff informed Ms. Walton that he was concerned about simply agreeing to what Temple was dictating, particularly since it was against medical advice, and that he was not able to obtain an immediate medical opinion about it; plaintiff was willing to return to work without a new medical certification and continue attempting to negotiate a reasonable accommodation while he worked.

123.  On April 29, 2019, plaintiff emailed Ms. Hamilton – EOC Manager, regarding his concerns regarding being given an ultimatum to accept a purported accommodation against medical advice, and being denied to come back to work unless he did so; plaintiff had already informed Ms. Hamilton that he believed the defendant's management was intentionally building a case to justify terminating his employment, and that they were retaliating against him for his complaints regarding their racially discriminatory handling of him and his attempts to promote racial and ethnic diversity at Temple; a former Temple employee had informed plaintiff that the EOC office had previously mishandled her complaint by failing to interview key witnesses – the complaint involved issues related to mental health.

124.  Plaintiff had informed Ms. Walton in June 2018, that he believed that his

management was trying to find pretextual reasons to justify firing him.

125.   On April 30, 2019, Ms. Hamilton emailed plaintiff back, informing him that she did not know what she could do regarding the issue of reasonable accommodation, although her office was responsible for protecting the rights of disabled persons, rather she referred plaintiff to Mr. Tom Johnston, Workers compensation and Absence Control Manager, and back to Ms. Diedre Walton, Employee/Labor Relations; Ms. Hamilton was unhelpful to plaintiff and did not properly address his concerns.

126.  Ms. Hamilton eventually referred plaintiff to Andrea Seiss on May 2, 2019, Temple's ADA coordinator, who was supposed to address the issue of reasonable accommodations; plaintiff called Ms. Seiss multiple times and left messages for her to call him back, however she never contacted plaintiff back.

127.  Ms. Culbreath-Walton informed plaintiff that her "offer" of being allowed to work from home (or remotely) once per month, was a decision by plaintiff's "leadership"; plaintiff made repeated requests of her for a meeting to discuss the issue of being allowed to return to work with or without reasonable accommodations,  and to have an interactive process; Ms. Culbreath-Walton declined to schedule a meeting.

45

128.  On May 6, 2019, plaintiff emailed Ms. Culbreath-Walton requesting

a meeting to address reasonable accommodations with her and anyone else who

was responsible for the decision.

129.  On May 8, 2019, plaintiff spoke with Mr. Johnston by phone to attempt

to address and resolve the issue of reasonable accommodations, particularly for

his disability and conditions of anxiety and depression; plaintiff informed Mr.

Johnson that it would be impossible for him to immediately find a new doctor

who could see him, examine him, and write up an evaluation within the time

Temple was giving him, as well as that he was willing to come back to work while

a reasonable accommodation could be agreed to.

130.  Mr. Johnston informed plaintiff that the fact that he did not have a

doctor (therapist) at that time, was "on you"; Johnston stated this in the presence

of another employee from his department, who was also on the phone; Johnston

told plaintiff that he would be fired if he did not bring in medical documentation

and that Temple was unwilling to make any additional options available.

131.  Later that day, Johnston sent a confusing email to plaintiff, and plaintiff

responded to him indicating his confusion regarding what Johnston had stated

earlier, regarding that he would be fired for absences and that he no longer had a

46

doctor to complete the documentation that Temple stated it required to allow

him to return to work (and to approve what Temple was recommending); plaintiff

also sought clarity regarding what the email meant regarding that plaintiff might

be able to take a medical leave of absence – this was particularly in the context

when Ms. Hall had previously told plaintiff that if he took a medical leave of

absence that he would be fired.

132. Mr. Johnston's email and "offer" to take a medical leave of absence was

not a valid offer to plaintiff, because it also required that plaintiff be required to

immediately obtain medical documentation from a doctor, which Temple knew

he did not have – it was impossible for plaintiff to obtain such certification within

the time that Temple allowed.

133. It is inexplicable why Temple simply would not allow plaintiff to return

to work pending having some form of interactive process to attempt to find a

reasonable accommodation, as plaintiff had returned to work for three days prior

to being refused to work further, after he would not agree to accept what Temple

dictated as a reasonable accommodation – it was Temple who arbitrarily refused

what plaintiff's former therapist had recommended, and then refused to continue

to allow plaintiff to work unless he submitted to its dictates.

134.  Even if plaintiff had been allowed to take a medical leave of absence, assuming he had been able to obtain a medical certification within the time frame that Temple required it, he had already been given conflicting information that he would be fired if he took one, and he would lose his position as ADMA.

135.  Mr. Johnston gave plaintiff an unreasonable amount of time until May 22, 2019 to obtain medical certification, that he qualified for a medical leave of absence – plaintiff did not need a medical leave of absence, he merely needed a reasonable accommodation, and even without one, he was willing to come back to work without one, but Temple would not let him return to work.

136.  On May 9, 2019, plaintiff unsuccessfully attempted to obtain a medical appointment with his previous therapist's office, to have another therapist in that office complete the forms that Mr. Johnston had given him for a medical leave of absence.

137.  On May 9, 2019 at 1:24 p.m., plaintiff received an email with a letter from Mr. Johnston informing him that he was fired, which contradicted Johnston's prior representation that plaintiff would have until May 22, 2019 to return documentation for a medical leave of absence.

138.  Temple refused to engage in any form of interactive process to attempt

provide a reasonable accommodation for plaintiff, nor did the accommodation

that plaintiff requested based on his prior therapist's written recommendation

pose an undue hardship to Temple, which the defendant knew.

139.  Temple refused to engage in an interactive process with plaintiff because

it sought to end his employment based on racial discrimination and retaliation for

complaining of it; Temple never informed plaintiff how it came up with the

purported accommodation that he be allowed to work remotely once per month.

140.  Defendant terminated plaintiff's employment based on disability

discrimination because it had observed the manifestation of plaintiff's disability,

and knew that there would likely be recurrences, some of which would require

that he take time off to deal with, and it did not want to have to reasonably

accommodate plaintiff in the future; despite denying plaintiff to work remotely as

needed, defendant knew that his entire department and the University worked

remotely as a matter or course.

141. Temple terminated plaintiff's employment out of retaliation for plaintiff

taking advantage of the Family Medical Leave Act (FMLA) by taking leave under

the act from late October 2018 until late April 2019; defendant also knew at the

time that it terminated plaintiff's employment, that he had applied for promotion to the newly created position of Associate Director for Diversity Initiatives and Community Relations.

142.  Temple terminated plaintiff's employment based on racial discrimination and for retaliation for complaining of it, which angered his management, including Mr. Van Blunk and Ms. Mormando in particular.

143. Temple's employees who were required to assist plaintiff with concerns regarding racial discrimination, disability discrimination and retaliation, all refused to properly do so, including Ms. Culbreath-Walton, Ms. Hall, Ms. Walton, Ms. Seiss and Mr. Johnston – upon information and belief, they worked together with his managers to end plaintiff's employment.

144.  Ms. Mormando attempted to give Ms. Brown and Ms. Culbreath-Walton misinformation in a meeting, that plaintiff was a "loose cannon", which she knew was false, and she had no basis for making such a communication.

145.  Defendant disproportionately did not hire African Americans and/or Blacks to work in the "Multicultural Affairs" department, not hiring any since it had hired plaintiff in 2016, while conversely it hired several Caucasian employees

in that time period; Mr. Van Blunk sought to justify this disparity by stating that it was hard to find people of color willing to accept the salary that was being offered.

146.   Defendant knew that plaintiff's requested medically advised request for reasonable accommodation, would not hinder his ability to complete the essential functions of his job.

147.   Plaintiff complained to Ms. Culbreath-Walton in June 2018, that he believed that he was being retaliated against for challenging racial discrimination in his department; he complained to Ms. Hamilton in November and December 2018 of the same.

148.   On May 13, 2019, plaintiff had to go to the Temple's financial aid office – he was still a Temple doctorate student; when he entered Conwell Hall, he was informed that there was a "banned" poster posted in the building, purportedly banning plaintiff from buildings on campus.

149.   Plaintiff saw the poster, which has the words, "Police Only Banned", with a clear photograph of plaintiff's face underneath it, and the words, "Temple University Police Department" (and its address and telephone number); the poster states, "the above pictured male, Tyree Williams DOB 12.06.1982, TU ID #

908189990, is currently banned and not permitted in Conwell or Wachman Hall.
He may attempt to present himself as Temple University faculty/guest in good
standing.  If he is observed in these buildings, contact Campus Police immediately
so incident can be documented, and he escorted from premise.  5/09/2019".

150.  Plaintiff requested that Temple security call the telephone number on
the poster to inform the police that he was a student at Temple, and that he
needed access to the financial aid office (he needed access to the university that
any other student had, and had a right to such access), and requested that
security ask what the process would be.

151.  The security guard did call the Temple police department and informed it
that plaintiff was in the building and that he was not threatening, and merely
wanted clarity about the poster, banning him; plaintiff also called Ms.  Jefferson
of Temple Human Resources office, explaining to her what was happening.

152.  Temple University police Officers (defendants) Sabir and Mitchell
came to the scene, at which time plaintiff attempted to explain to them what was
happening, including the fact that he was a doctoral student at the school in good
standing, however they were not responsive to what he was saying; rather they
became aggressive with plaintiff.

153.  Defendants Sabir and Mitchell asked plaintiff for his student identification, at which time Ms. Jefferson was telling plaintiff via phone, to step outside so she could speak to the officers; at that time, defendant Sabir pushed plaintiff back as he was trying to leave, and then defendant Mitchell grabbed plaintiff by his left wrist.

154.  There were students present while Sabir and Mitchell were handling plaintiff, and they became agitated with what they were observing, expressing their discontent with the defendants' conduct against plaintiff; it appeared that people had their cell phones out as if they might be filming the incident; admissions' staff were also present and viewed the incident, one of whom (Delores) was particularly upset at what she observed and left a voicemail message about the incident with plaintiff, and expressing her concerns about it.

155.  Ms. Jefferson informed the defendants that plaintiff was not banned, however they disputed this, until finally claiming to verify that plaintiff should not have been banned, or was not banned from Conwell Hall; prior to the incident on May 13, 2019, nobody from Temple, including its police department, had ever told plaintiff that he was banned from anywhere at Temple, or that a poster(s) had been posted indicating that he was banned.

156.  Plaintiff had done nothing warranting being banned from any building or anywhere at Temple, which defendant knew; he filed a complaint about what occurred on May 13, 2019 with the Temple University Police Department.

157.  On May 15, 2019, plaintiff met with Ms. Valerie Harrison, Senior Advisor for Equity, Diversity and Inclusion, to discuss his ADA issue – Ms. Harrison held the meeting in the atrium of her office rather than in her office; when plaintiff attempted to explain his situation to her, and his confusion about what was happening, she was unresponsive, and falsely told plaintiff that he was disrupting other people in the building who were working; when plaintiff told her about the incident on May 13, 2019, she responded that it was only his opinion that the "banned poster" should not have been posted and that he must have done something for the police to have posted it and that plaintiff also must have done something to deserve how defendants Mitchell and Sabir had treated him – these statements were made within earshot of people who were in/near the atrium; Ms. Harrison's statements were false, as Ms. Brown from human resources had already told plaintiff and the police at the time of the incident that the poster never should have been posted and that it was unjustified; Harrison and former "provost" Epps had told plaintiff in 2017 that they had met with Ms.

Mormando about concerns about the lack of student diversity at Temple, but found that there was nothing deficient about her efforts; Harrison had also promised to assist plaintiff in obtaining data about diversity he had requested, but it was not provided.

FIRST CAUSE OF ACTION – VIOLATION OF TITLE VII AGAINST
DEFENDANT TEMPLE UNIVERISTY – TERMS AND CONDITIONS OF EMPLOYMENT

158.  Plaintiff incorporates paragraphs 1-157 above as though fully set forth herein.

159. Plaintiff was qualified for his position at all times relevant to his claims above.

160.  Plaintiff was intentionally subjected to different and worse terms and conditions of his employment by defendant, based on his race, than his similarly situated Caucasian peers.

161. Plaintiff was terminated from his employment based on his race, African-American.

162. As a result of the differential and worse treatment that plaintiff suffered from defendant's conduct, he experienced extreme emotional distress, and economic loss.

WHEREFORE, plaintiff requests judgment in his favor against defendant and he requests the following relief:

    a.  Back pay;

    b.  Front pay;

    c.  Compensatory damages;

    d.  Punitive damages;

    e.  Reasonable attorney's fees and costs:

    f.  Any other relief the Court deems appropriate.

SECOND CAUSE OF ACTION – VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT BASED ON RACE AS TO DEFENDANT TEMPLE UNIVERSITY

163.  Plaintiff incorporates paragraphs 1-162 as though fully set forth herein.

164.  Plaintiff was subjected to a hostile work environment based on his race African-American, including by his managers/supervisors, other of defendant's management, some of his co-workers (whom his management failed to take proper corrective actions for regarding their racially discriminatory conduct).

165.  Defendant's conduct described more thoroughly above, including making racist remarks, making hostile remarks, thwarting plaintiff from properly doing his

job, false blame and criticism, defamatory conduct, sabotaging conduct, ignoring plaintiff's efforts to promote diversity, and other conduct was ongoing and it was severe and pervasive.

166.  Plaintiff's terms and conditions from defendant's conduct, which was Intentional, negatively altered his terms and conditions of employment, and caused plaintiff extreme emotional distress, and would have caused a reasonable person in plaintiff's position to suffer such harm.

167.  Defendant's conduct was done intentionally by plaintiff's supervisors/management and/or condoned by them.

168.  Plaintiff suffered extreme emotional harm as a result of defendant's conduct, including that it caused and/or exacerbated his depression and anxiety related disorders.

WHEREFORE, plaintiff requests judgment in his favor against defendant, and he requests the following relief:

1.  Compensatory damages;

2.  Punitive damages;

3.  Reasonable attorney's fees and costs;

4.  Any other relief the Court deems appropriate.

THIRD CAUSE OF ACTION – VIOLATION OF TITLE VII BASED ON RETALIATION AS TO DEFENDANT TEMPLE UNIVERSITY

169.   Plaintiff incorporates paragraphs 1-168 as though fully set forth herein.

170.   Plaintiff complained of racial discrimination in the form of informal complaints directly to his management, to defendant's EOC office, and to its human resources management, all within 300 day of the filing of his of his EEOC charge referred to above.

171.  As a result of plaintiff's complaints of racial discrimination, he was retaliated against by defendant by, including but limited to, subjecting him to a hostile work environment, by false criticisms, intentionally denying his requests relating to improving diversity, false characterization of his performance and character, defamatory conduct, forced, false discipline in the form of a directive to attend baseless communications training, further being singled out from his similarly situated Caucasian peers for negative treatment, intentionally being denied a reasonable accommodation for his disability, and refusal to engage in an interactive process to accommodate it, termination from employment, and defaming plaintiff after his termination from employment, by posting a false poster banning him from parts of defendant's campus.

58

172.  Defendant's retaliatory conduct caused plaintiff severe emotional

distress, which caused him physical harm, and severe economic harm.

WHEREFORE, plaintiff requests judgment in his favor against defendant, and he

requests the following relief:

      a.  Back pay;

      b.  Front pay;

      c.  Compensatory damages;

      d.  Punitive damages;

      e.  Reasonable attorney's fees and costs;

      f.  Any other relief the Court deems appropriate.

### FOUTH CAUSE OF ACTION – VIOLATION OF 42 U.S.C. S 1981 AS TO DEFENDANT TEMPLE UNIVERSITY FOR RACIAL DISCRIMINATION BASED ON TERMS AND CONDITONS OF EMPLOYMENT AND TERMINATION FROM EMPLOYMENT

173.  Plaintiff incorporates paragraphs 1-172 as though fully set forth herein.

174.  Plaintiff was intentionally treated dissimilarly and worse than his

Caucasian similarly situated co-workers and peers by his

supervisors/management, based on his race, African American, with respect to his

terms and conditions of employment, including being terminated from

59

employment based on his race, during his employment with defendant.

175.  Plaintiff suffered severe emotional distress and severe economic harm

from defendant's conduct.

WHEREFORE, plaintiff requests judgment in his favor against defendant, and he

requests the following relief:

      a.  Back pay;

      b.  Front pay;

      c.  Compensatory damages

      d.  Punitive damages;

      e.  Reasonable attorney's fees and costs;

      f.  Any other relief the Court deems appropriate.

FIFTH CAUSE OF ACTION – VIOLATION OF 42 U.S.C. S 1981 – HOSTILE WORK
ENVIRONMENT BASED ON RACE AS TO DEFENDANT TEMPLE UNIVERSITY

176.  Plaintiff incorporates paragraphs 1-175 as though fully set forth herein.

177.  Plaintiff was subjected to a racially hostile work environment by the

Intentional acts of defendant's management, and their condonation of racial

discrimination and racially hostile conduct by its non-managerial employees

against plaintiff.

178. Defendant's conduct caused plaintiff severe emotional harm.

WHERFORE, plaintiff requests judgment in his favor against defendant, and he

requests the following relief:

      a.  Compensatory damages;

      b.  Punitive damages;

      c.  Reasonable attorney's fees and costs;

      d.  Any other relief the Court deems appropriate.

SIXTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF 42 U.S.C. S 1981
AS TO DEFENDANT TEMPLE UNIVERSITY

179.  Plaintiff incorporates paragraph 1-178 above as though fully set forth

herein.

180.  Plaintiff made repeated complaints of racial discrimination to defendant

directly to his supervisors/managers, to other appropriate managers at Temple,

as indicated above, only to be met with retaliatory conduct, including but not

limited to the conduct described in summary in paragraph 171 above.

181.  Plaintiff was terminated from employment as a result of complaining of

racial discrimination.

182.  As a result of defendant's retaliatory conduct, plaintiff suffered severe

emotional distress and severe economic harm.

WHEREFORE, plaintiff requests judgment in his favor against defendant, and he requests the following relief:

    a.  Back pay;

    b.  Front pay;

    c.  Compensatory damages;

    d.  Punitive damages;

    e.  Reasonable attorney's fees and costs;

    f.  Any other relief the Court deems appropriate.

### SEVENTH CAUSE OF ACTION – VIOLATION OF THE ADA AND ADAA FOR DISABILITY DISCRIMINATION AS TO DEFENDANT TEMPLE UNIVERSITY

183.   Plaintiff incorporates paragraphs 1-182 above as though fully set forth herein.

184.   Plaintiff is disabled as a result of depression, anxiety and panic related disorders, which substantially impaired one or more of his major life activities, including work, as described in writing to defendant by his physician.

185.  Plaintiff was able to perform the essential functions of his employment with or without reasonable accommodations.

186.  After plaintiff had to take family medical leave from late October 2018 until April 24, 2019, defendant arbitrarily and intentionally refused to honor his physician's written request for a reasonable accommodation, and after refusing it, defendant refused to engage in an interactive process with plaintiff to come up with a reasonable accommodation.

187.  Plaintiff's request for reasonable accommodation would not have caused defendant any undue hardship, which it knew; defendant refused to allow plaintiff to return to work after he had worked through April 26, 2019, unless he provided it with medical certification that he accepted its offer to work remotely once per month – defendant knew that this was impossible because plaintiff had no physician at the time to write such a certification, which could only be ethically written after scheduling plaintiff for an appointment, conducting an examination and writing a report; even if plaintiff had been able to see a doctor, there was no guarantee that any physician would agree with what the defendant was imposing on plaintiff.

188.  Defendant gave plaintiff an unreasonable amount of time to comply with its dictate described above, and while plaintiff was also attempting to obtain a

medical certification for a medical leave of absence, which defendant proposed, defendant fired him the next day on May 9, 2019, reneging on its prior offer to allow him until May 22, 2019 to obtain such a certification.

189.   Defendant's conduct described above was done to intentionally thwart and prevent plaintiff from returning to work, and was done for the purpose of firing plaintiff on the false basis that he missed three consecutive days of work in a row without authorization, when it was the defendant who arbitrarily refused to let plaintiff return to work after April 26, 2019.

190.   Defendant sought to and did fire plaintiff as a result of his disability, because it did not want to have to reasonably accommodate him in the future.

WHEREFORE, plaintiff requests judgment in his favor against defendant, and he requests the following relief:

a.   Back pay;

b.   Front pay;

c.   Compensatory damages;

d.   Punitive damages;

e.   Reasonable attorney's fees and costs;

f.   Any other relief the Court deems appropriate.

EIGHTH CAUSE OF ACTION – VIOLATION OF THE FAMILY MEDICAL LEAVE ACT
BASED ON RETALIATION AS TO DEFENDANT TEMPLE UNIVERSITY

191.  Plaintiff incorporates paragraphs 1-190 above as though fully set forth

herein.

192.  Plaintiff took leave under the Family Medical Leave Act (FMLA) from

October 26, 2018 until April 24, 2019.

193.  Defendant retaliated against plaintiff for taking FMLA leave, by firing him.

WHEREFORE, plaintiff requests judgment in his favor against defendant and he

requests the following relief:

> a.  Back pay;
>
> b.  Front pay;
>
> c.  Liquidated damages;
>
> d.  Reasonable attorney's fees and costs;
>
> e.  Any other relief the Court deems appropriate.

NINTH CAUSE OF ACTION – VIOLATION OF 42 U.S.C. S 1983 AS TO DEFENDANTS
SABIR AND MITCHELL

194.  Plaintiff incorporates paragraphs 1-193 above as though fully set forth

herein.

195.  On May 13, 2019, at approximately 12:56 P.M. at Temple's Conwell

Hall, defendants Sabir and Mitchell responded to plaintiff after plaintiff had come to the school regarding financial aid as a student – plaintiff had a right to be on the campus and in the hall.

196.  Defendant Sabir pushed plaintiff for no justified reason, and defendant Mitchell seized plaintiff forcefully by grabbing him by the wrists, as if he was trying to apprehend him.

197.  Defendant Sabir's conduct and defendant Mitchell's conduct amounted to illegal seizure of and subjection to excessive force, against plaintiff in violation of plaintiff's rights to be free of illegal seizure and excessive force, which acts are in violation of 42 U.S.C. S 1983; defendants lacked probable cause to seize plaintiff.

198.  As a result of defendants' conduct,  plaintiff experienced severe emotional distress:

WHEREFORE, plaintiff requests judgment in his favor against defendants Sabir and Mitchell, jointly and severally and he requests the following relief:

a.  Compensatory damages;

b.  Punitive damages;

c.  Reasonable attorney's fees and costs;

d.  Any other relief the Court deems appropriate.

TENTH CAUSE OF ACTION – VIOLATION OF THE PENNSYLVANIA HUMAN
RELATIONS ACT AS TO DEFENDANT TEMPLE UNIVERSITY

199.  Plaintiff incorporates paragraphs 1-198 as though fully set forth herein.

200.  Defendant's conduct described above constitutes violations of the

Pennsylvania Human Relations Act (PHRA) for racial discrimination, retaliation and

disability discrimination.

201.  Plaintiff suffered severe emotional distress and severe economic harm

from defendant's conduct.

WHEREFORE, plaintiff requests judgment in his favor against defendant, and he

requests the following relief:

a.  Back pay;

b.  Front pay;

c.  Compensatory damages;

d.  Any other relief the Court deems appropriate.

ELEVENTH CAUSE OF ACTION – DEFAMATION IN VIOLATION OF 43 PA. C.S.
S 8343 AS TO DEFENDANT TEMPLE UNIVERSITY

202.  Plaintiff incorporates paragraphs 1-201 above as though fully set forth

herein.

203. Defendant, through its Police Department, and/or other agents knowingly and/or recklessly published false statements about plaintiff in writing to the general public between May 9-13, 2019, including Temple University's student population, faculties, guest to the University, and administrators, that plaintiff was justifiably banned from the certain halls at the University, and also falsely stated that he might fraudulently attempt to deceive people at Temple University that he was a student and/or faculty at "Temple" who had a right to be there; the poster also stated that anyone who observes plaintiff in the prohibited buildings should immediately call the Temple Police Department, so that they could respond to plaintiff and escort him off of the premises.

204. Temple's "banning poster" was defamatory in its meaning, because It stated that plaintiff did not have the right to be on campus in the cited buildings, which was false, that plaintiff would act fraudulently (that he was trespassing, a crime), and that he had done something worthy of a police response, of being escorted from the premises, which was false.

205. The people who observed and read defendant's publication, which was published to the general population, understood the publication to refer to plaintiff and they understood the defamatory character of the publication.

206. The publication contained the implicit messages that plaintiff was not honest, and that he was a lawbreaker, or had committed serious misconduct worthy of being "banned".

207. Defendant was not privileged to publish the known falsity in the "banned poster", and it published the falsity to persons beyond those who might need to know the information in the poster, assuming only for the sake of argument that limited publication might be necessary – but it was not because it was false.

208. Defendant's publication was made with malice.

209. As a result of defendant's false publication which it published to the general public, plaintiff suffered damage to his personal and professional reputations severe emotional distress.

210. On May 15, 2019, Ms. Harrison defamed plaintiff when they met in the Atrium of her office, which was her choice of location, rather than inside her office; at that time she falsely stated in the earshot of employees and students, that plaintiff had done something worthy of being banned of campus, and that he had done something worthy of being seized and subjected to excessive force by defendants Sabir and Mitchell on May 15, 2019; she also falsely stated within

earshot of employees and students that plaintiff was being disruptive, in their meeting.

211.  All of the statements and communications described above in this count, harmed plaintiff's personal and professional reputations, and caused him severe emotional distress, embarrassment, and humiliation.

WHEREFORE, plaintiff requests judgment in his favor against defendant, and he requests the following relief:

    a.  Compensatory damages;

    b.  Punitive damages;

    c.  Any other relief the Court deems appropriate.

### TWELVETH CAUSE OF ACTION – VIOLATION OF PRIVACY AS TO DEFENDANT TEMPLE UNIVERSITY

212.  Plaintiff incorporates paragraphs 1-211 above as though fully set forth herein.

213.  Defendant intentionally published private information about plaintiff, which contained false information about him, using his likeness without his permission from May 9-13, 2019, in a poster that was published to the general public at Conwell Hall and the Welcome Center" on those dates.

70

214.  The poster which contained a photograph of plaintiff's face, purported to ban plaintiff from buildings on campus, stating that he might fraudulently attempt to convince people that he was faculty and/or student in good standing at the Temple, and informing the general public that it should call the police if it saw plaintiff in the buildings so that they could remove him from the premises.

215.  Plaintiff was not banned from the buildings referenced, as he was a doctoral student in good standing at Temple; he was not "banned", and he had not done anything to warrant police responding to him and escorting him from the premises, all of which defendant knew.

216.  Defendant conduct intentionally published plaintiff's likeness without his permission, inferentially intruding on his personal conflict with Temple regarding his employment, and falsely depicted him as being banned, being fraudulent, and being someone such as a criminal and/or disorderly person, that needed to be escorted away by Temple police – placing him in a false light.

217.  Ms. Harrison's intentionally published false statements about plaintiff indicated in paragraph 210 above, placed plaintiff in a false light as a person who was disruptive, disorderly, and had engaged in possible illegal activity, to which the Temple police were justified in seizing him and using force against him –

Harrison intentionally made these statements in the atrium, rather than appropriately meeting with plaintiff in her office, because she desired to paint a false picture of plaintiff to the general public.

218.  As a result of defendant's violation of his privacy, plaintiff suffered severe emotional distress.

WHEREFORE, plaintiff requests judgment in his favor against defendant and he requests the following relief:

a.  Compensatory damages;

b.  Punitive damages.

### THIRTEENTH CAUSE OF ACTION AS TO DEFENDANTS TEMPLE UNIVERSITY, SABIR AND MITCHELL FOR ASSAULT AND BATTERY

219.  Plaintiff incorporates paragraphs 1-218 above as though fully set forth herein.

220.  On May 13, 2019, defendants Sabir and Mitchell, Temple University police officers, intentionally assaulted and battered plaintiff by placing him in imminent apprehension that they would touch him in an offensive manner, and they proceeded to do so, by pushing and grabbing him.

221.  The aforementioned defendants are agents of defendant Temple

University, who were acting in the scope of their respective duties as Temple

police officers when they assaulted and battered plaintiff, and defendant Temple

University is vicariously responsible for their respective acts.

222.  Plaintiff suffered severe emotional distress as a result of defendants'

conduct.

WHEREFORE, plaintiff requests judgment in his favor against defendants jointly

and severally and he requests the following relief:

a.  Compensatory damages;

b.  Punitive damages.

Respectfully submitted,

/s/Reginald Allen, Esquire